IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LATOSHIA E. DONALD, } | |
| } | |
| Plaintiff, } | |
| } | CIVIL ACTION NO. |
| v. } | |
| } | 2:14-cv-727-WMA |
| UAB HOSPITAL MANAGEMENT, LLC, } | |
| } | |
| Defendant. } | |

### MEMORANDUM OPINION

Before the court are the motion for summary judgment (Doc. 27) and motion to strike (Doc. 34) filed by defendant UAB Hospital Management, LLC ("UAB"). For the reasons stated below, the motion for summary judgment will be granted in part and denied in part, and the motion to strike will be granted.

### BACKGROUND[1]

Plaintiff Latoshia Donald ("Donald"), an African-American female, worked for UAB as a nurse in the Trauma Burn Intensive Care Unit ("TBICU") from October 2012 until April 2013. (Docs. 25 at 2, ¶ 9, 29-2 at 32:4-10, 124). Donald's immediate supervisor was Tywanda Coates, who is also African-American. (Docs. 29-2 at 32:11-13, 29-3 at 54:20-22).

Donald contends that, throughout her employment with UAB, she and the other African-American nurses in the TBICU were treated

---

[1] The facts are presented in the light most favorable to Donald, the non-movant. *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

less favorably than the white nurses were treated, and a racial divide existed among the nurses. (Doc. 29-2 at 43:20). For instance, when Donald's white former supervisor noticed that all of the African-Americans were assigned to work near each other, the supervisor remarked, "How did that happen? I wonder if any work is going to be done." (Doc. 29-2 at 34:15-17). When that supervisor was leaving UAB, the white nurses organized a going-away party for him and brought supplies but did not inform the African-Americans or ask them to bring anything to the event, causing them to be embarrassed. (Doc. 29-2 at 35:1-6). On one occasion, Donald needed help with an assignment, but the white "float" nurses, who were supposed to help nurses assigned to particular patients as needed, did not help her, instead choosing to watch her from the door of the patient's room. (Doc. 29-2 at 36:14-37:5). The white nurses were also more lenient with the families of white patients than with black families, allowing the white families to exceed the size limitation for visits but asking the black families to leave. (Docs. 29-2 at 46:7-10, 32-1 at 6, 45').

More notable are the African-Americans' interactions with Coates. Donald testified that Coates's demeanor toward the African-American nurses was more harsh than with the white nurses; she was friendly to the whites but dismissive with the African-Americans. (Doc. 29-2 at 78:14-18). Whenever an incident occurred for which an African-American nurse potentially bore responsibility, Coates was

aggressive and accusatory, seemingly having already decided that the African-American was at fault. (Doc. 29-2 at 77:6-9). Coates frequently called the African-Americans into her office to discuss potential disciplinary issues. (Doc. 29-2 at 52:9-14).

In March 2013, two of the African-American nurses, Caitlyn Lett and Ashley Byers, were involved in a verbal altercation in the TBICU, and Donald attempted to calm them. (Doc. 29-2 at 40:14-41:11). After the incident, Coates changed the shift patterns of Lett and Byers so that they would no longer be working together or on their current shift. (Doc. 29-2 at 42:15-18). UAB contends that the pattern change came as a result of this incident, but Donald believes otherwise. According to Donald, Coates told her that she was going to separate the African-Americans because they were intimidating the white nurses. (Doc. 29-2 at 38:10-19). Coates admits that she intended to move more nurses than only Byers and Lett. (Doc. 29-2 at 120-21). Byers testified that Coates informed her of the plan to separate the African-American nurses, even before the incident with Lett, because the white nurses were "scared" of the African-American nurses. (Doc. 32-2 at 3, ¶ 9).

The African-American nurses (Donald, Lett, Byers, and Jasmine Frey) attended a meeting on April 8, 2013, with Melissa Levesque, a white Human Resources representative. (Docs. 29-2 at 45:11-16, 29-3 at 52:7-9). They complained during the meeting about all of the above-mentioned issues, focusing especially on their treatment

by Coates and the shift changes. (Doc. 32-1 at 6-7). The group, including Donald specifically, complained several times that this treatment was on account of their race, but Levesque repeatedly attempted to downplay the racial aspects of their complaints. (*Id.*). Levesque at one point stated that she might be scared or intimidated by the group if she felt outnumbered. (Doc. 32-1 at 7, 1'-3'). Donald testified that the group felt as if Levesque treated them as the problem during the meeting. (Doc. 29-2 at 47:19-22). Levesque noted during the meeting that Donald had the least seniority of any of the group members and, according to Byers, seemed particularly displeased that Donald characterized the issues as race-based. (Docs. 32-1 at 7, 49', 32-2 at 3, ¶ 6). Levesque called Coates after the meeting, but Coates testified that Levesque did not mention any allegations of discrimination. (Doc. 29-3 at 19:17-20:14).

Three days later, on the night of April 11, 2013, a patient and her family made a complaint against a nurse, identifying the nurse only as being black. (Doc. 29-3 at 24:8-19, 64). Coates testified that she determined from the assignment sheet that the complaint must have been against Donald. (Doc. 29-3 at 38:7-18). The assignment sheet listed Donald as having been assigned to the patient's bed, but the on-duty float nurses, one of whom was black, also had responsibility for the patient and could have been in the room. (Docs. 29-11 at 2, 32-1 at 3). The patient and family

complained to Coates that the nurse had made several rude comments, handled the patient roughly, did not acknowledge the family, did not properly answer their questions or give them updates, and was mean to her coworkers (identified as "two black guys"). (Docs. 29-2 at 60:14-15, 29-3 at 64). The patient said that she was afraid to complain because of what the nurse might do to her. If the patient could have reached the phone, she said she would have called 911. (Doc. 29-3 at 64). The patient's minister also said that the nurse was "not very friendly." (*Id.*).

Coates forwarded the information to Levesque. (*Id.*). Levesque recommended that, if the allegations were accurate, Donald should be terminated while she was still within her probationary period. (Doc. 29-3 at 65). Under UAB's probationary policy, an employee may be dismissed at any time within the first six months of employment if her performance is "not satisfactory." (Doc. 29-16 at 20). Donald's probationary period was set to expire in only a few days. (Doc. 29-2 at 62:11-14). Coates and Levesque then prepared a termination letter. (Doc. 29-3 at 69-72).

Coates met with Donald before her next shift. (Doc. 29-3 at 28:19-22). Coates asked Donald to tell her about her shift the night before. (Doc. 29-2 at 59:17-19). Donald took this to be a question about some abnormal lab work, so she only addressed that issue. (Doc. 29-2 at 59:19-21). Coates found Donald's answer insufficient because she failed to mention the patient complaint,

but Donald testified that she had no knowledge of the patient complaint and that she did not do what the patient and family accused her of. (Docs. 29-2 at 58:14-60:2, 29-3 at 29:12-30:23). Coates then revealed the termination letter to Donald. (Doc. 29-2 at 59:22-60:2). Donald attempted to refute the grounds for termination, but Coates did not believe her. (Doc. 29-2 at 60:5-61:18). Coates testified that she had an honest and good faith belief that the complaint was true, primarily because she believed that the patient and family had no reason to lie about the complaint. (Doc. 29-3 at 50:20-51:5, 57:18-19). Coates made this decision even though she had never known Donald to lie and had previously told Donald that some patient complaints are just about race. (Docs. 29-2 at 55:17-20, 29-3 at 57:20-22). Coates also testified that she did not consider utilizing UAB's progressive discipline policy because of the egregiousness of the complaint, despite Donald's otherwise satisfactory performance and lack of prior discipline. (Doc. 29-3 at 17:4-10, 36:3-9).

Donald filed a Charge of Discrimination with the EEOC on June 10, 2013, and received her right-to-sue letter on April 11, 2014. (Doc. 1-1). She filed suit against UAB on April 21, 2014, alleging Title VII claims of a racially hostile work environment, race discrimination, and retaliation. (Doc. 1). On June 29, 2015, the court ordered Donald to dismiss either her race discrimination or retaliation claim in accordance with the Supreme Court's decision

in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013). (Doc. 24). Donald complied on July 6, 2015, dismissing her race discrimination claim. (Doc. 25). UAB moved for summary judgment on August 10, 2015, seeking dismissal of Donald's remaining claims. (Doc. 27). On September 14, 2015, UAB moved to strike a portion of Donald's declaration submitted in support of her opposition to UAB's motion for summary judgment. (Doc. 34).

## DISCUSSION

### A. Motion to Strike

Fed. R. Civ. P. 56(c)(4) provides that a declaration submitted to support or oppose a summary judgment motion must "set out facts that would be admissible in evidence." A party may object to submitted materials if those materials "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Applying this rule, the Eleventh Circuit has held that "inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (footnote omitted) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

UAB has moved to strike one paragraph of Donald's declaration, regarding a conversation that Donald had with the son of the complaining patient. According to the declaration, the son wanted some information about his mother directly from Donald because his aunt (the complaining sister) "has a way of fabricating things."

(Doc. 32-1 at 4).

UAB contends that the son's statement is inadmissible hearsay. Donald attempts to defend the statement by invoking two hearsay exceptions. The first is Fed. R. Evid. 803(21), under which "[a] reputation among a person's associates or in the community concerning the person's character" is admissible. According to Donald, the son's statement regards the reputation of his aunt's character for truthfulness, so it should be admitted. The statement, however, provides no indication of whether he was talking about the aunt's reputation among some community or just his own personal opinion. When invoking this exception, the community from which the reputation is drawn must be "well-defined," laying a trustworthy foundation. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 100 (3d Cir. 1999). Here, however, there is no evidence that the son was drawing from a community at all, much less a community that is well-defined. This exception does not render the statement admissible.

Donald also invokes Fed. R. Evid. 803(3), arguing that the statement is admissible as "[a] statement of the declarant's then-existing state of mind (such as motive . . .)." According to Donald, the statement shows the son's motive for speaking to Donald: he wanted to verify the information that his aunt told him. "However, before a statement, otherwise hearsay, can be admitted under 803(3) to show the declarant's then existing state of mind,

the declarant's state of mind must be a relevant issue in the case." *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987). Donald does not seek admission of the statement in order to show the son's state of mind, but only to show that the patient complaint is unreliable. Accordingly, UAB's motion to strike will be granted.

**B. Motion for Summary Judgment**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**1. Hostile Work Environment**

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). This prohibition extends to the creation of a racially hostile work environment.

9

*Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). For such a claim to be actionable, a plaintiff must prove five elements:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248-49 (11th Cir. 2014). UAB concedes all but the fourth element.

"The determination of whether race-based harassment was so severe or pervasive as to alter the conditions of employment includes both subjective and objective components." *Jones v. UPS Ground Freight*, 633 F.3d 1283, 1299 (11th Cir. 2012) (quoting *EEOC v. Xerxes Corp.*, 639 F.3d 658, 676 (4th Cir. 2011)). At the summary judgment stage, however, the subjective requirements should be assumed to be satisfied, and the court does so here. *See id.* When evaluating the objective component, the Supreme Court has provided four non-exhaustive factors to consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams*, 754 F.3d at 1250-51 (quoting *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)). "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the

circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246.

The court finds the Eleventh Circuit's recent decision in *Adams* to be instructive. In that case, the plaintiffs complained of pervasive racist conduct at the defendant's facility, including nooses being displayed, racist and sexually laden graffiti drawn on the walls of bathrooms and boats, repeated use of racist slurs and comments, kicking of an African-American, and pervasive Confederate flag apparel. 754 F.3d at 1246. Of the thirteen appealing plaintiffs, the Eleventh Circuit found that only seven of them presented an issue of fact as to severity or pervasiveness. *Id.* at 1251-57. The court primarily made this determination based on the conduct to which the plaintiffs were actually exposed and the extent to which it was directed at them. For example, a plaintiff who discovered two nooses, was the subject of a crude drawing, and who personally witnessed racist comments, physical abuse, and pervasive Confederate flag apparel stated a sufficient claim. *Id.* at 1251-52. The same is true of plaintiffs who were the subject of racial slurs, discovered nooses hanging, or very frequently observed the above-described conduct. *Id.* at 1252-54. However, the court found that plaintiffs who were not the subject of racist slurs and comments and did not discover the nooses, but only heard

about them, did not present an issue of fact. The court found this despite the fact that these plaintiffs observed racist graffiti and Confederate flag apparel up to a daily basis, heard racist slurs and comments being made, and were aware of the nooses being hung. *Id.* at 1254-57.

The conduct Donald complains of in this case falls far short of the conduct complained of by even the losing plaintiffs in *Adams*, much less the winning ones. Donald was not subjected to racist comments or symbols and witnessed no physical harm to any African-American. Donald has presented no evidence of physical threats, and the frequency and severity fall far short of the standard established by the Eleventh Circuit in *Adams*. At best, Donald's complaints amount to "petty slights, minor annoyances, and simple lack of good manners," which the Supreme Court has held to be insufficient. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Accordingly, Donald's hostile work environment claim will be dismissed.

### 2. Retaliation

Absent direct evidence of retaliatory intent, Title VII retaliation claims are evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). "To establish a prima facie showing of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression;

(2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004)). If the employee meets this burden, the burden shifts "to the employer . . . [to] produc[e] legitimate, [non-retaliatory] reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

If the employer meets this "exceedingly light" burden, *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (quoting *Turnes v. Amsouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994)), the employee then "bears the burden of showing that the reasons offered were merely pretext," *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). An employee may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "[T]o avoid summary judgment [the employee] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for [retaliation]." *Brooks v. Cty. Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)).

### a. Prima Facie Case

UAB first challenges Donald's ability to demonstrate a prima facie case of retaliation. Specifically, UAB disputes that Donald engaged in protected activity, but if she did, that there is a causal connection between Donald's alleged protected activity and her termination.

Donald contends that she engaged in protected activity by participating in the April 8, 2013, meeting with Human Resources representative Levesque. UAB argues that the meeting does not constitute protected activity because the EEOC found that the meeting primarily addressed "general unhappiness and cliques," not race discrimination. (Doc. 29-2 at 122). UAB agrees with that assessment, but the court at the summary judgment stage cannot. An EEOC finding may or may not be admissible, but it is certainly not binding. While the audio recording of the meeting evidences some concerns that are not necessarily race-related, Donald and the others plainly complained that they were treated differently because of their race. (Doc. 32-1 at 6 (37', 44'), 7 (1', 10', 43', 47')). That Levesque attempted to downplay the racial aspects of their complaints does not change the fact that the complaints were made. While a jury may agree with UAB, this court cannot find that this meeting, as a matter of law, did not constitute protected activity. This prima facie requirement is accordingly met.

UAB next contends, based on three grounds, that Donald has not

14

demonstrated a causal connection between the HR meeting and her termination. First, UAB claims that Coates, the decisionmaker, had no knowledge that racial complaints were made during the HR meeting, negating any causal connection. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). Even accepting Coates's testimony that Levesque did not inform her of the racial complaints, the court is unpersuaded by UAB's position because a jury could easily find that Coates was not the sole decisionmaker. Viewed in the light most favorable to Donald, the evidence shows that Coates informed Levesque of the situation and Levesque, who knew of the racial complaints made in the meeting, recommended termination. UAB contends that because Coates had the authority to make the decision on her own, Levesque's knowledge is irrelevant, but that position is plainly untenable. The pertinent inquiry is how the decision actually was made, not how it could have been made, and a jury could find that Levesque played a part in the decision to terminate Donald. At this juncture, the knowledge requirement is satisfied.

UAB's next two arguments regarding a causal connection are somewhat related to each other. UAB correctly argues that Donald may not rely on temporal proximity alone to establish a causal connection. *See Montgomery v. Bd. of Trs. of the Univ. of Ala.*, No. 2:12-cv-2148-WMA, 2015 WL 1893471 (N.D. Ala. Apr. 27, 2015). Donald, however, does not rely solely on temporal proximity.

Instead, Donald would demonstrate a causal connection through the combination of Levesque's knowledge of the racial complaints and involvement in the termination decision, the remarkably close temporal proximity - four days - between the meeting and termination, and the pretextual nature of the termination. UAB counters with its third reason for a lack of a causal connection: the patient complaint, not retaliation, was the true reason for Donald's termination. Because the parties have essentially combined the causal connection and pretext inquiries, and because the court finds that a jury question is presented as to the pretextual nature of Donald's termination, the court likewise determines that a jury could find that an intent to retaliate was the "but-for" cause of Donald's termination. *See Nassar*, 133 S. Ct. 2517.

### b. Pretext

As stated above, UAB contends that it terminated Donald for a legitimate, non-retaliatory reason: that she provided poor care to the complaining patient. Based upon several reasons, Donald argues that UAB's proffered reason was pretextual and that she was actually terminated in retaliation for complaining about racial discrimination. The court finds that Donald presents an issue of fact that must be decided by a jury, not the court.

Donald first argues, and the court agrees, that the investigation into the patient complaint was quite cursory, which can demonstrate pretext. *See Wolf v. PRD Mgmt., Inc.*, No. 11-2736,

2013 WL 3949019, at *6 n.8 (D.N.J. Aug. 1, 2013). After Coates was notified of the patient complaint, she talked to the patient and her family, determined from the assignment sheet that Donald was assigned to the patient, and questioned Donald about the incident in her termination meeting. That was the full extent of the "investigation." (Doc. 29-3 at 30:15-19).

The complaints only identified the offending nurse by her race, and Donald was not the only African-American with responsibility for the patient, because an African-American float nurse was on duty that night and certainly could have been in the patient's room. Yet, even after Donald denied the conduct of which she was accused, and even though Coates had never known Donald to lie, Coates made no inquiry into whether the complaint may have been about a different nurse. Similarly, the patient complained that the nurse was rude to her coworkers, identified as "two black guys." Donald gave Coates the names of the two men to which the patient was likely referring, one of whom has since denied that Donald was rude to him. (Doc. 29-2 at 87:6-14). Even though these two may have been able to give an eyewitness account, Coates approached neither of them. Coates failed to conduct this investigation despite Donald's repeated denial of the incident, which Coates disbelieved because, in her mind, the patient and family had no reason to lie, even though the patient only identified the relevant actors by their race, and Coates previously

17

told Donald that some patient complaints are only about race.

UAB contends that Donald was given a fair opportunity to discuss her side of the patient complaint by virtue of Coates's open-ended question about Donald's previous shift, but the court disagrees. Donald understood Coates's question to be referencing a different incident, and by the time Donald discerned what the question was actually about, Coates was entirely dismissive of her denials, choosing instead to believe the patient. Given the circumstances pointing to the need for a more thorough investigation, a jury could find that UAB's cursory investigation shows that the reason for termination was pretextual.

Additionally, Donald had no history of discipline, yet, despite UAB's general progressive discipline policy, (Doc. 29-16 at 32-33), Donald was terminated because of a single patient complaint. While this fact would not independently demonstrate pretext, it is another consideration for the jury.

UAB argues that it is shielded by Coates's testimony that she believed in good faith that the patient complaint was valid. According to UAB, because of this belief, concerns over the investigation or severity of punishment are simply quibbling with its business judgment and do not demonstrate pretext. The pretext inquiry exists, however, to determine whether Coates in fact held that good faith belief, not to quarrel with her judgment. Simply put, an employer cannot insulate itself from liability simply by

invoking "good faith belief" as magic words. The court is still tasked with determining the veracity of that assertion.

UAB also contends that Coates's being the same race as Donald undercuts any assertion that Donald's termination was illegitimate. The court questions whether such an inference would apply in retaliation cases, but regardless the Supreme Court foreclosed this argument when it "rejected any conclusive presumption that an employer will not discriminate against members of his own race," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

In addition to evidence that UAB's proffered reason was not the true reason for the termination, Donald has presented evidence that retaliation was the real reason. *See Marable v. Marion Military Inst.*, 595 F. App'x 921, 924-25 (11th Cir. 2014) ("A reason is not pretextual unless it is shown both that the reason was false, and that retaliation was the real reason."). During the meeting with Levesque, Levesque plainly attempted to discourage the group from characterizing their issues as race-based. According to one of the nurses in the meeting, Levesque seemed particularly displeased when Donald, the member of the group with the least seniority, "frankly stat[ed] that [they] were being bullied because of [their] race." (Doc. 32-2 at 3, ¶ 6). Donald was the only member of the group on probationary status, meaning that adverse action could be taken against her with less required justification. Given these facts, a jury could find that Donald's termination was

actually motivated by a desire to silence claims of race discrimination, not as a result of substandard care to a patient. Accordingly, summary judgment on the retaliation claim will be denied.

## CONCLUSION

For the reasons stated above, UAB's motion for summary judgment (Doc. 27) will be granted as to Donald's hostile work environment claim but denied as to her retaliation claim. UAB's motion to strike (Doc. 34) will be granted.

A separate order will be entered.

DONE this 9th day of October, 2015.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE